AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Meta Platforms, Inc. Instagram Account diegobonilllo

)
)
)
)
)
)

Case No. **24-mj-03343**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952, 960, and 963 | Importation of controlled substances and conspiracy related thereto |

The application is based on these facts:

See Affidavit of Special Agent Sarah Cordes which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Sarah Cordes*

*Applicant's signature*

Sarah Cordes, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____telephone_____ *(specify reliable electronic means)*.

Date: _____08/30/2024_____

*Judge's signature*

City and state: San Diego, California

Hon. David D. Leshner, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR A SEARCH WARRANT**

I, Sarah Cordes, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application for a search warrant for information associated with the following Instagram account that is stored at premises owned, maintained, controlled, and/or operated by Meta Platforms, Inc. (Meta), an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way in Menlo Park, California 94025:

Username: diegobonilllo (the **Target Account**);

as described further in Attachment A for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, as described in Attachment B. This affidavit is made in support of an application for a search warrant under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the United States copies of the information (including the content of communications) described in Section II of Attachment B. Upon receipt of the information, United States-authorized persons will review that information to locate the items described in Section III of Attachment B.

2.      The facts set forth in this affidavit are based on my own personal knowledge, including my review of social media records; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers who have personal knowledge of the events and circumstances described herein; my review of documents and reports related to this investigation; and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the applications for the search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. Conversations are set forth below in substance unless noted. My interpretations of certain statements are set forth in brackets and are based upon my

knowledge of this investigation and my training and experience. Dates, times, and amounts are approximate.

### BACKGROUND AND EXPERIENCE

3.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since June 2023. I am currently assigned to the San Diego Field Office where I handle public corruption and border corruption cases as a member of the Border Corruption Task Force (BCTF). I am charged with investigating allegations of corrupt federal, state, and local public officials that engage in criminal activity for profit, power, as well as those criminal associates who bribe and conspire with any corrupt federal, state, or local public officials. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4.      As an investigative or law enforcement officer, I spent five months at the FBI academy where I received specialized training in a variety of investigative and legal matters, including training in conducting narcotics investigations and becoming familiar with the manner in which controlled substances are packaged, marketed, transported, and consumed.

5.      On the job, I have participated in multiple separate investigations involving the importation and distribution of controlled substances. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, pen register and trap and trace devices, telephone toll analysis, undercover operations, tracking warrants, search warrants, and electronic examinations of evidence. Through these investigations, my training, experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics.

6.     Based on my training and experience, I also am familiar with how drug traffickers communicate and operate. For example, I am aware that drug traffickers frequently discuss criminal activity using social media accounts because they enable drug traffickers to maintain contact with associates, suppliers, and customers. I am further aware that drug traffickers use social media accounts to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing federally controlled substances and for arranging the disposition of proceeds from the sales of controlled substances. They also often use coded language to obscure conversations about their unlawful activity because they believe coded language makes it more difficult for law enforcement to detect their illicit conduct. Through the totality of my training and experience, I have familiarized myself with the jargon employed by importers and distributors of controlled substances.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

**A.     Background**

8.     On May 3, 2024, a grand jury returned an under-seal Indictment charging eleven counts of drug trafficking activity against Customs and Border Protection Officers (CBPOs) Diego BONILLO, Jesse GARCIA, and a third individual who remains a fugitive. The charges include conspiracy to import controlled substances, in violation of Title 21, United States Code, Sections 952, 960, and 963; multiple counts of importation of controlled substances and aiding and abetting, in violation of Title 21, United States Code, Sections 952 and 960, and Title 18, United States Code, Section 2; *Pinkerton* liability; and criminal forfeiture. BONILLO was arrested on May 4, 2024.

9. BONILLO's and GARCIA's arrests stemmed from a long-term investigation by FBI BCTF, with assistance from the Drug Enforcement Administration (DEA). The investigation found that BONILLO and GARCIA worked with a Mexico-based poly-drug Drug Trafficking Organization (DTO) to ensure that the DTO's drug-laden vehicles were admitted into the United States without inspection at the Otay Mesa, California and Tecate, California Ports of Entry (POEs), respectively.

10. As CBPOs, BONILLO and GARCIA were randomly assigned to various locations throughout their respective POEs in one-hour assignments, which were posted daily. The randomness and limited duration of the assignments, as well as the timing of the posting of the schedule, were efforts by CBP to reduce the potential for corruption. Nevertheless, the investigation reflected that BONILLO and GARCIA relayed their duty assignments to DTO members, including the times when they were assigned to the primary vehicle lanes and the specific lanes under their control, so that load vehicles could enter into the United States with their assistance free from inspection.

11. To date, investigators have identified at least five drug seizures associated with BONILLO and GARCIA.

**B. Nayeli Viridriana Servin Vega Smuggles Narcotics with the Assistance of the User of the Target Account**

12. On February 6, 2024, at 12:54 p.m., Nayeli Viridriana Servin Vega entered the United States from Mexico at the Tecate POE in a Honda Odyssey bearing California license plates. Records from the POE reflect that GARCIA was assigned to work the primary vehicle lanes from 12:00 p.m. to 1:00 p.m. They also reflect that she was admitted by GARCIA despite there being an Automatic Referral for "High Risk Narcotics/Currency Smuggling" on the Odyssey. GARCIA subsequently told POE staff that he had received the alert late, which resulted in him admitting the Odyssey. However, an audit of GARCIA's computer revealed that the Automatic Referral was received approximately 55 seconds before he admitted the Odyssey.

13.     After Servin was admitted into the United States, undercover officers surveilled her from a few minutes after her admission until a traffic stop was conducted on her in Chula Vista, California. A K-9 alerted to the Odyssey, and a total of approximately 130 packages of methamphetamine, weighing approximately 58.87 kilograms, were found concealed inside a non-factory compartment located in the Odyssey's floorboard. The official DEA lab report is pending, although a presumptive test has reflected that one of the packages contained methamphetamine. Servin was arrested, and a telephone was seized.

14.     In addition to GARCIA, crossing records of Servin reflect that she coordinated her crossings in order to be admitted by BONILLO. For example, before crossing through the Tecate POE, Servin crossed 32 times through the Otay Mesa POE vehicle lanes. Five of those crossings were through BONILLO's lane, which reflects a coordinated effort. Indeed, the remaining 27 crossings were through lanes operated by 25 separate CBPOs. Moreover, telephone evidence reflects that she was loaded and in contact with known co-conspirators on dates she crossed through BONILLO's lanes, and not at other times she crossed through the Otay Mesa POE. For example, on November 25, 2023, Servin entered the United States from Mexico at the Otay Mesa POE through a vehicle lane manned by BONILLO. Hours later, she took a picture of the Fusion Ultra Lounge located in Anaheim, California, where it appears she had been directed to deliver the drug load. On February 10, 2024, DEA investigators in Los Angeles executed a search warrant at the Fusion Ultra Lounge and seized approximately 225 pounds of methamphetamine, 1 kilogram of cocaine, and 10,000 fentanyl pills.

15.     Similarly, on December 14, 2023, after Servin entered the United States from Mexico at the Otay Mesa POE through BONILLO's lane, telephone evidence reflects that she had the following WhatsApp exchange with a co-conspirator:

| | |
|---|---|
| Servin: | I'm about to get to San Clemente (audio message) |
| Servin: | I just passed secondary checkpoint |
| Co-Conspirator: | Were they there |

5

Servin:                No, closed. Do you have an address yet?

16.    Investigators are aware that there is a checkpoint located near San Clemente, California. Investigators are further aware that the operational status of checkpoints is often of concern to drug traffickers because vehicles carrying drugs may be identified by law enforcement officers or K-9s working at the checkpoints. As such, investigators believe, based on training and experience, that Servin had imported federally controlled substances on this date. Further bolstering this belief is that, two minutes before Servin was admitted by BONILLO on this date, BONILLO also admitted Gonzalez, who is discussed below, *and*, less than 20 minutes after Servin was admitted, BONILLO admitted Arquimides Jesus De Los Santos Rabiela[1] who, like Servin, was arrested on February 6, 2024, shortly after crossing through GARCIA's lane at the Tecate POE. His vehicle was found to contain approximately 32.35 kilograms of fentanyl, 37.1 kilograms of methamphetamine, and 54.6 kilograms of cocaine.

## C.    Coordination by BONILLO with Gonzalez and Others

17.    On February 15, 2024, a CBPO working pre-primary at the Otay Mesa POE inspected a Buick LaCrosse being driven by Luis Francisco Gonzalez-Montenegro. During the pre-primary inspection, the CBPO observed packages in one of the quarter panels and called-out over the radio "SDNET," which is an enforcement group that surreptitiously follows drug-laden vehicles from the POE in order to gain intelligence about other criminal associates and stash locations. The CBPO also notified the primary officer – BONILLO – and requested that the LaCrosse be sent to the secondary inspection area. Gonzalez was only one car away from BONILLO's booth at the time the discovery was made.[2] Notably,

---

[1]    Also, on the date of Rabiela's arrest, Gonzalez crossed immediately behind Rabiela through GARCIA's lane and then traveled in tandem with Rabiela until Rabiela was pulled over by San Diego Sheriff's Deputies. Investigators then observed Gonzalez circle the location of the traffic stop several times before leaving the area.

[2]    BONILLO has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

crossing records reflect that Gonzalez was admitted *four* other times by BONILLO at the Otay Mesa POE – a statistically improbable number of crossings unless coordinated.

18.     In secondary, a Z-Portal scan showed anomalies within the doors and rear quarter panels of the LaCrosse. A K-9 also alerted to the LaCrosse's trunk. Gonzalez and the LaCrosse were subsequently admitted into the United States, after placement of a GPS tracker, so that SDNET could follow it to its destination. Despite not being told that anything was amiss before he was released from the secondary inspection area, Gonzalez engaged in highly surveillance-cautious maneuvers after leaving the POE, including driving aggressively and making sudden U-turns. Investigators are aware that such efforts are typically utilized by drug traffickers in an effort to ferret out whether they are being followed. Gonzalez eventually parked the LaCrosse in a public parking area and then fled out of the back of a store after convincing a store manager that he was in danger. The LaCrosse was left behind. Given Gonzalez's immediate suspicion after leaving the POE, investigators believe that BONILLO likely tipped-off the DTO that SDNET would be following Gonzalez. Indeed, actions by other members of the DTO confirm this belief. For example, as investigators watched, a different individual, later identified as Jamie Rose Perez, arrived after several hours to the LaCrosse. She then drove it to a few locations, including trying to stay the evening at a hotel, before parking the LaCrosse on the street overnight. She later returned the next day and drove it to a residence where it was taken into a garage.

19.     A search warrant was then obtained for the residence. During execution, three males, later identified as Michael Morales, Cesar Meza, and Armando Gallo ran from the garage towards the rear of the residence and were apprehended at an outside patio. Inside the residence, Perez and another woman named Sheila Torres also were apprehended. Notably, Meza has three vehicle crossings through lanes manned by GARCIA, and one crossing through a lane manned by BONILLO. Similarly, crossing records reflect that Torres also crossed through BONILLO's lane approximately 18 minutes after Gonzalez entered in the LaCrosse.

20.     A search of the LaCrosse resulted in the seizure of approximately 41 packages of fentanyl powder weighing approximately 43.42 kilograms; 3 packages of fentanyl pills, weighing approximately 2.18 kilograms; and 1 package of heroin, weighing approximately 1.01 kilograms. The packages were found concealed inside, among others, the vehicle's quarter panels, left door panels, and right passenger door panel. An additional 24 packages of fentanyl powder and 11 packages of fentanyl pills also were found in two duffle bags inside the residence.

21.     After her arrest, Torres was given the chance to make a call and told investigators that she wanted to call her cousin, who she identified as "Melissa." When the call was placed to the Mexican number of her supposed cousin, a male answered. Torres asked for Melissa, but the male seemed confused. This prompted Torres to exclaim, "Diego!" and state that she was in jail. The male then hung up. BONILLO's first name is "Diego," although investigators are unaware of whether this was BONILLO.

**D.     Identifying the Target Account**

22.     Since BONILLO's arrest, investigators have been monitoring his jail calls. The jail calls appear to reflect efforts by BONILLO to direct his relatives and close associates to conceal or destroy evidence. For example, during a recorded jail call with his brother-in-law, Erick Monsalvo, on or about May 4, 2024, BONILLO asked if there was any trouble at the house[3] and instructed, "If they want to search, only what's mine, like my room, not your room, or the garage. So, if they have a warrant, tell them which room is mine and that I am renting it out. It's not right they search the other rooms and the garage."

23.     Based on training and experience, investigators are aware that individuals in custody often attempt to relay covert messages during jail calls because they are aware that their communications are monitored by law enforcement. Here, investigators believed that BONILLO was covertly instructing his brother-in-law to conceal and/or impede investigators' ability to obtain additional evidence of his wrongdoing by encouraging

---

[3]     Investigators are aware that BONILLO lives with Monsalvo.

Monsalvo to conceal such evidence in his own room and/or by stopping law enforcement from accessing common areas of their residence, including the garage. Indeed, investigators' belief that BONILLO's intention was to impede law enforcement was bolstered by Monsalvo's denial to law enforcement in May 2024 that BONILLO was involved in the buying and selling of vehicles despite a recorded jail conversation with BONILLO only days earlier in which BONILLO stated he "has three cars with Marco" and instructed Monsalvo to "tell Albert to tell Marco about the cars and the parts that are at the house." Investigators subsequently obtained a warrant for the residence and seized an Apple laptop computer concealed between the mattress and bedside table in Monsalvo's bedroom that matched the identifiers of an empty Apple laptop computer box found in BONILLO's bedroom closet. Monsalvo subsequently admitted to investigators that the laptop investigators found in his bedroom belongs to BONILLO.[4]

24.     Based on training and experience, investigators also believe that BONILLO attempted to conceal and/or impede investigators' ability to obtain evidence of his wrongdoing when he instructed Monsalvo to deactivate the **Target Account**. Specifically, on June 2, 2024, during a recorded telephone call between BONILLO and Monsalvo (who was joined on the call by a female believed to be BONILLO's sister and Monsalvo's wife), BONILLO instructed:[5]

BONILLO:     I want to know if you can get into my Instagram and close it; not close just deactivate it temporarily.

---

[4]     Monsalvo has since claimed to investigators that BONILLO's Apple laptop computer was located in his bedroom because he brought the laptop computer to his bedroom when he attempted to try and deactivate the **Target Account** (discussed in paragraph 24). Monsalvo also has claimed that he truthfully disclosed in his May 2024 interview that BONILLO was involved in the buying and selling of vehicles and that the three investigators who participated in the interview either are lying about his denial or have experienced a collective hallucination about what he stated. Notably, BONILLO's girlfriend, too, has since claimed that her denial that BONILLO was involved in the buying and selling of vehicles also was the result of a misunderstanding by investigators.
[5]     This conversation occurred in Spanish but has been translated by a Spanish-speaking interpreter into English.

Female:            Yes, to put it so nobody can see it.

BONILLO:          Aha.

Female:            Yes, but tell me your email and your password.

25.    During the call, BONILLO identified his Instagram username as "diegobonilllo," *i.e.*, the **Target Account**. He also provided a number of passwords; however, based on the call, it appears that efforts to access the **Target Account** in order to deactivate it were unsuccessful because BONILLO could not recall the correct password or reset the password. An open source search reflects that the **Target Account** remains active, although the account is private, meaning that only BONILLO's friends can access its contents.

26.    Notably, during the call, BONILLO seemed to explain that his desire to deactivate the **Target Account** was to thwart law enforcement:

Female:            If you remember another day, let me know.

BONILLO:          It was just so they [law enforcement] won't get any contacts, any friends. Don't worry about it.

Female:            Yes, so they [law enforcement] are not snooping around. So if you remember another one, and you are sure, you tell me.

27.    Based on training and experience, the context of this conversation, and the other apparent obstructionist acts outlined above, investigators believe that BONILLO's instruction to deactivate the **Target Account** was because evidence of his crimes, including potentially the identities of co-conspirators, is located in the **Target Account**.

28.    Indeed, investigators are aware that Instagram has been utilized by coordinators of prior smuggling events by this DTO in order to facilitate the crimes under investigation. For example, on August 22, 2023, Amanda Mancera applied for entry from Mexico into the United States at the Tecate POE as the driver of her Toyota Camry. GARCIA admitted her. Records received from the Tecate POE reflect that GARCIA had

been assigned to the pedestrian entry lanes at the time he admitted Mancera but had switched with another CBPO to work the vehicle primary lane shortly before she entered.

29. Mancera was later arrested at the Route 94 checkpoint located only approximately 15 miles from the Tecate POE. Packages were found concealed in the Camry's trunk under a blanket, all four doors, the rear quarter panels, and underneath the front-passenger carpets. The DEA lab has since confirmed that the packages contained a total of 3.99 kilograms of fentanyl and 216 kilograms of cocaine. Mancera has since pled guilty to two counts of possession with intent to distribute federally controlled substances. As part of her guilty plea, Mancera admitted that the Camry was loaded with the fentanyl and cocaine at the time she crossed the border at the Tecate POE.

30. As with the other couriers outlined above, Mancera's crossing pattern reflects that she coordinated her crossings in order to be admitted by GARCIA. Indeed, crossing records reflect that she crossed through vehicle lanes manned by GARCIA on approximately 12 of the 32 times she crossed through the Tecate POE. One of those dates was July 27, 2023. In anticipation of that crossing, the evening before, an individual with the Instagram vanity name "Emilio Ruben" messaged Mancera on Instagram, "They said that tomorrow early[.]" She responded, "Like pull up tonight ?" and he said, "ye[.]"

31. The next morning, July 27, 2023, beginning at approximately 10:30 a.m., Emilio and Mancera had the following Instagram exchange:

| Emilio: | Yo |
| Mancera: | What's up |
| Emilio: | I'm gon head for you |
| Mancera: | Ok |
| Emilio: | Here |

32. At approximately 10:46 a.m., Mancera messaged Emilio to "Just double check the time frame started at 10:30[.]" Records obtained from the Tecate POE reflect that GARCIA was assigned to work the vehicle primary lanes from 10:30 a.m. to 11:30 a.m. on this date. At approximately 10:57 a.m., Emilio responded, "Yes" and "Go[.]" At 10:58

11

a.m., Mancera entered the United States from Mexico at the Tecate POE. Mancera was admitted by GARCIA.[6]

33.     As such, given that at least one of the DTO's coordinators with apparent knowledge of the officers' schedules utilized Instagram to coordinate the crimes under investigation, as well as BONILLO's request that Monsalvo deactivate his Instagram account ". . . so they [law enforcement] won't get any contacts . . . [,]" investigators believe that there is probable cause to believe that the **Target Account** will obtain evidence of BONILLO's drug-trafficking activities, including potentially the identities of co-conspirators.

**BACKGROUND CONCERNING INSTAGRAM**

34.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by Title 18, United States Code, Sections 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts through which users can share messages, multimedia, and other information with other Instagram users and the general public.

35.     Meta collects basic contact and personal identifying information from users during the Instagram registration process. This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail address(es), physical address(es) (including city, state, and zip code), telephone number(s), credit card or bank account number(s), and other personal identifiers. Meta keeps records of changes made to this information. In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and

---

[6]     Although Mancera never crossed through lanes manned by BONILLO, the crossing patterns outlined above reflect that couriers, including Servin, Rabiela, and Gonzalez, were directed by the DTO's coordinators to cross through lanes manned by both officers.

the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36. Meta also collects and retains information about how each user accesses and uses Instagram. This includes information about the Internet Protocol (IP) addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

37. Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time. Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

38. Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account. Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality. For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service. Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

39. Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers). Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments. Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

40.    Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users. Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions. Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users. Users can also manually search for friends or associates.

41.    Each Instagram user has a profile page where certain content they create and share (posts) can be viewed either by the general public or only the user's followers, depending on privacy settings. Users can customize their profile by adding their name, a photo, a short biography (Bio), and a website address.

42.    One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos. Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users (tag), or add a location. These appear as posts on the user's profile. Users can remove posts from their profiles by deleting or archiving them. Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

43.    Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram. Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can mention others by adding their username to a comment followed by @). An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

44.    An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours. Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted. The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

45.    Instagram allows users to broadcast live video from their profiles. Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

46.    Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups. These messages may include text, photos, videos, posts, videos, profiles, and other information. Participants to a group conversation can name the group and send invitations to others to join. Instagram users can send individual or group messages with disappearing photos or videos that can only be viewed by recipients once or twice, depending on settings. Senders cannot view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot. Instagram Direct also enables users to video chat with each other directly or in groups.

47.    Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps. Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

48.    Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag. Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram. Meta retains records of a user's search history and followed hashtags.

49.    Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

50.    Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize

ads, offers, and other sponsored content. Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers. This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.\

51.    For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

## ITEMS TO BE SEIZED

52.    Based on training and experience, investigators are aware that evidence of who was using an Instagram account and from where, and evidence related to criminal activity of the kind at issue here, may be found in the files and records described above and in Attachment B. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. For example, investigators know that individuals working with criminal organizations often use multiple communication platforms in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Indeed, based on training and experience, investigators are aware that social media services, such as Instagram, are often created and used to coordinate criminal activity, payments, and meetings; and to conduct negotiations and other matters relating to criminal schemes through social media messages, photos, audio files, and/or videos. Thus, stored communications and files connected to the **Target Account** may provide direct evidence of the offenses under investigation.

53.    Account activity may also provide relevant insight into an account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime) or consciousness of guilt (*e.g.*, deleting

account information in an effort to conceal evidence from law enforcement). Also, other information connected to the use of the **Target Account** may lead to the discovery of additional evidence. For example, messages, contacts, and other information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation, including addresses and/or vehicles used by the subjects of the investigation. Therefore, Meta's servers are likely to contain stored electronic communications and information constituting evidence of the crimes under investigation, including who has used or controlled the **Target Account**. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, device information, and the data associated with the foregoing (such as geo-location, date, and time) may be evidence of who used or controlled the **Target Account** at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices – and thereby which users – likely accessed the **Target Account**. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crimes under investigation.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

54. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Meta for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta. The impact on Meta's business would be severe.

55. Therefore, I request authority to seize all content from the **Target Account**, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta, to protect the rights of the subject(s) of the investigation, and to effectively pursue this investigation, authority

is sought to allow Meta to make a digital copy of the entire contents of the accounts subject to seizure, as described in Section II of Attachment B. The copy will be provided to me or to any authorized federal investigator. The copy will be forensically imaged, and the images will then be analyzed to identify communications and other data subject to seizure pursuant to Section III of Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

56.    Analyzing the data to be provided by Meta may require special technical skills, equipment, and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common applications do not store data as searchable text. The data may be saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

57.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to these warrants may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this Court.

58.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of the warrants. Based on training and experience, investigators are aware from training and experience that planning and coordinating a drug-importation offense often takes weeks. Investigators also know that criminal associates are often unaware of an arrest and will continue to attempt to contact the arrestee after his/her arrest. As such, investigators seek all materials from Apple for the **Target Account** from September 22, 2023 (a month prior to Servin's

first crossing in BONILLO's lane, which occurred on October 22, 2023), up to and including May 5, 2024 (the day after BONILLO's arrest).

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

59.     There have been no prior attempts to obtain this evidence, except that investigators have obtained search warrants for a telephone seized from BONILLO at the time of his arrest, his Apple iCloud account, and his Apple laptop computer. Investigators observed very little Instagram data from Apple, reflecting that he may not have backed-up his Instagram data to iCloud or may have deleted it. Similarly, his telephone also contains little Instagram data, reflecting again that it may have been deleted or that it was not accessed through his telephone. Investigators have not yet obtained data from his Apple laptop computer; however, there may be some duplicate data from a search of the laptop to the extent BONILLO often utilized it to access Instagram and did not delete the data.

## CONCLUSION

60.     Based on the forgoing, I request that the Court issue the proposed warrant.


*Sarah Cordes*
_____
Sarah Cordes
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 30th day of August 2024.

*David Leshner*
_____
HONORABLE DAVID D. LESHNER
UNITED STATED MAGISTRATE JUDGE

19

## <u>ATTACHMENT A</u>
## PROPERTY TO BE SEARCHED

This warrant applies to information associated with diegobonilllo (the **Target Account**), an Instagram account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way in Menlo Park, California 94025.

## ATTACHMENT B
## ITEMS TO BE SEIZED

## I.      Service of Warrant

The officer executing the warrant shall permit Meta Platforms, Inc. (Meta), as custodian of the files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.     Information to be Disclosed by Meta

To the extent that the information is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any information that has been deleted but is still available to Meta or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Meta is required to disclose for the account(s) listed in Attachment A (the **Target Account**) the following information from September 22, 2023, up to and including May 5, 2024, unless otherwise indicated:

A.      All subscriber and user information pertaining to the **Target Account**, in any form kept, including:

1.      Identity information (past and current), including full name(s), e-mail address(es), physical address(es), date(s) of birth, phone number(s) (including whether phone number(s) were verified), means and sources of payment (including any credit card(s) or bank account number(s)), gender, hometown, occupation, websites, and other personal identifiers and account information related thereto, including length of service and change history (*e.g.*, changes in registration email address(es), phone number(s), birthdate(s), etc.);

2.      All usernames, including ID numbers, and the date and time each username was active, all display names (past and current) and the date and time each display name was active, and all associated Instagram or third-party accounts (including those linked by machine cookie), including information about the user's access and use of these associated or third-party accounts;

3.      Device(s) used to login to or access the **Target Account**,

including all device identifiers;

4.      Internet Protocol (IP) addresses used to create, login, and/or use the **Target Account**, including associated dates, times, and port numbers;

5.      Communications between Meta and the user(s) of the **Target Account**, including contacts with support services; and,

6.      All location information associated with the **Target Account**, including location history, information geotags, check-ins, and related metadata.

B.      All content of the **Target Account**, including content created, uploaded, or shared by or with the **Target Account**, and records related thereto, in any form kept, including:

1.      All videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, fan pages, follows, followed hashtags, shares, invitations, and all associated logs and metadata and all records and other information related thereto, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit);

2.      All communications sent from or received by the **Target Account**, including direct and group messages, and all associated multimedia, logs, and metadata, including deleted and draft content if available, and all records and other information related thereto, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot); and,

3.      All records of searches performed by the **Target Account**.

C.      All records, in any form kept, relating to all other interactions between the **Target Account** and other users, including but not limited to:

1.      Interactions by other users with the **Target Account**, including

posts, comments, likes, tags, follows/friends (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, mentions, and pokes;

2.     All privacy settings, including privacy settings for individual posts; and,

3.     All users the **Target Account** have followed (including the close friends list), unfollowed, friended, blocked, unblocked, muted, restricted, or denied a request to follow/friend, and, to the extent such information is accessible through a search of data of the **Target Account**, users who have followed, unfollowed, friended, blocked, unblocked, muted, restricted, or denied a request to follow/friend the **Target Account**.

## III.   Information to be Seized by the United States

All information described above in Section II that constitutes evidence, fruits, and instrumentalities of violations of federal criminal law, namely, importation of federally controlled substances and conspiracy to do the same, in violation of Title 21, United States Code, Sections 952, 960, and 963, those violations involving the user(s) of the **Target Account**. Specifically:

A.     Electronic records, such as communications, photographs, audio files, videos, location data, and search history, indicating efforts to import federally controlled substances, which may include evidence of unexplained wealth;

B.     Evidence indicating when and where the **Target Account** was accessed or used to determine the user(s)' travel to or presence at locations involved in efforts to import federally controlled substances, such as stash houses, load locations, or meet/delivery points;

C.     Evidence indicating the motive, intent, or consciousness of guilt of the user(s) of the **Target Account** or their associates relating to the crimes under investigation, *i.e.*, the importation of federally controlled substances;

D.     Evidence indicating the identity of the person(s) who created or used the **Target Account**, including but not limited to records that help

reveal the whereabouts of such person(s) at key times, and,

E.    Evidence indicating the identity of person(s) who communicated with the **Target Account** about the importation of federally controlled substances, including their whereabouts.